UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CYRICUS MORGAN,<br>Plaintiff, | )<br>)<br>) Case No. 12 C 7858<br>)<br>) |
| v. | ) Magistrate Judge Geraldine Soat Brown<br>) |
| TOM DART, ET AL.,<br>Defendant. | )<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cyricus Morgan was a pretrial detainee at the Cook County Department of Corrections ("CCDOC") in 2012 when he alleges that defendant administrators, officers, and medical staff did not treat him properly and at times required him to walk without the crutches issued to him after breaking his ankle. (Am. Compl. ¶¶ 3, 21-22, 37.) [Dkt 21.][1] Without the use of his

---

[1] Morgan named 13 defendants, including three John Does, in his Amended Complaint. (Am. Compl. ¶¶ 4-16.) According to the docket, the three John Doe defendants were never served. The summons for Dr. Mohammad was returned unexecuted. (Summons Return, Jan. 7, 2014.) [Dkt 30.] While the docket reflects that Defendant Arrichellas was served, a review of the attached document indicates that service for that defendant was not accepted. (Summons Return, Jan. 7, 2014.) [Dkt 29.] Defense counsel moved to withdraw as the attorney for Defendant Arrichellas, stating that Cook County Sheriff's Office records indicate that no such employee exists. (Defs.' Mot. to Withdraw ¶¶ 6-7.) [Dkt 36.] The district judge granted that motion, and with a correct spelling of the defendant's name, directed defense counsel to "endeavor to identify that person, and if appropriate, waive service on his behalf." (Order, Feb. 6, 2014.) [Dkt 42.] There is no further reference to this defendant on the docket. At a status in April 2014, plaintiff agreed to submit an amended complaint including the names of all defendants. (Order, Apr. 22, 2014.) [Dkt 47.] The docket does not reflect that any such filing was ever made. The Motion for Summary Judgment now before the court was filed on behalf of the eight served defendants - Sheriff Dart, Director Miller, Scott Bratlien, Sergeant Jones, Sergeant Perry, Officer Harris, Officer Hawker, and Dr. Sunita Williamson. (Defs.' Mem. at 1.) [Dkt 67.]

crutches or any other assistive device, Morgan claims, he experienced both significant pain and permanent damage to his injured foot, and a fall that resulted in a back injury. (*Id*. ¶¶ 23, 29, 36.) Morgan alleges that these actions constitute deliberate indifference to his serious medical needs. (*Id.* ¶¶ 39-40.) The motion by defendants Sheriff Dart, Director Miller, Superintendent Bratlien, Sergeant Jones, Sergeant Perry, Officer Harris, Officer Hawker, and Dr. Williamson for summary judgment is before the court. (Defs.' Mot.) [Dkt 65.][2] For the reasons set forth below, Defendants' motion is granted.

## JURISDICTION

There is subject matter jurisdiction under 28 U.S.C. § 1331 because the matter arises under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution. The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636. [Dkt 51.]

---

[2] Pursuant to Federal Rule of Civil Procedure 56 and Northern District of Illinois Local Rule 56.1(a), defendants have filed a statement of material facts (Defs.' Facts) [dkt 66] and a memorandum of law in support of their motion (Defs.' Mem.) [dkt 67]. Because plaintiff Cyricus Morgan is proceeding *pro se*, defendants also served a Notice to Pro Se Litigant Opposing Summary Judgment pursuant to Local Rule 56.2. (Defs.' Notice) [Dkt 68.] (Although the notice says it is for *pro se* litigant Mansour Mohammad, the text clearly indicates it was meant for Morgan because it says "Defendants have moved for summary judgment against you.") Defendants' motion was filed and served in January 2015. [Dkt 65.] Morgan was allowed two months to respond. (Order, Jan. 22, 2015.) [Dkt 70.] Morgan filed a response to defendants' statement of material facts. (Pl.'s Fact Resp.) [Dkt 73.] He was allowed an extension to file a written memorandum in response (Order, April 1, 2015) [dkt 74], and then a final extension to June 12, 2015 (Order.) [dkt 78]. Because neither the court nor the defendants received a response from Morgan, the court allowed him to respond orally to defendants' motion at the status hearing on July 2, 2015. Defendants replied in writing. [Dkt 79.] More than two months after the final deadline for his response, Morgan filed a motion to extend time to file a written response. [Dkt 81.] That motion is denied. The court has considered not only Morgan's response to defendants' statement of facts, but also his oral response on July 2, the exhibits attached to his complaint, and his deposition testimony.

2

# BACKGROUND[3]

Morgan entered CCDOC as a pretrial detainee in August 2009 and was housed in Division 1, a maximum security division. (Defs.' Facts ¶¶ 1, 2; Defs.' Facts, Ex. A, Dep. of Cyricus Morgan at 26.) Morgan injured his left foot while playing football during recreation time on June 13, 2012. (Defs.' Facts ¶ 14). Morgan was taken to Cermak Health Services of Cook County ("Cermak") that same day for treatment, where x-rays indicated he fractured his left 5th metatarsal. (*Id.* ¶¶ 15, 17; Defs.' Facts, Ex. H, Morgan's Cermak Medical Record at 25.)[4] The doctor at Cermak placed Morgan in a soft cast, prescribed him crutches and Ibuprofen, and referred him to an orthopedic surgeon, all on June 13, 2012. (Defs.' Facts ¶¶ 19-21; Medical Record at 170-71.) Four of Morgan's toes on his right foot had been amputated previously due to a gunshot wound prior to his arrival at CCDOC. (Morgan Dep. at 53-54; Medical Record at 68.) Morgan acknowledges that he has no complaints about his initial treatment. (Morgan Dep. at 32.)

Early on the morning of June 14, 2012, Morgan was discharged from Cermak and moved from Division 1 to Division 10 at CCDOC. (Defs.' Facts. ¶ 23; Morgan Dep. at 37-38.) Division

---

[3] Morgan's Response to Defendants' Statement of Material Facts fails to comply with the Northern District of Illinois Local Rule 56.1(b)(3)(A), which requires that the non-movant's response contain numbered paragraphs "each corresponding to and stating a concise summary of the paragraph to which it is directed . . . ." The purpose of that rule is to allow the court to see in one document what is disputed and undisputed. Morgan did not do that; rather he listed the paragraphs that are disputed and undisputed. Accordingly, the court must look to Defendants' Statement of Material Facts to see what facts are undisputed. Unless otherwise indicated, citations to Defendants' Statement of Material Facts are statements Morgan does not dispute.

[4] Ossa Metatarsi, or the metatarsal bones, are "[t]he five bones . . . extending from the tarsus to the phalanges of the toes, being numbered in the same sequence from the most medial to the most lateral." *Dorland's Illustrated Medical Dictionary* 1341 (32d ed. 2012) [herinafter *Dorland's*].

10 is a medical division and has 24-hour access to medical care. (Defs.' Facts ¶¶ 23-24; Morgan Dep. at 43; Defs.' Facts, Ex. C, Aff. of Michael Miller ¶ 5; Defs.' Facts, Ex. D, Aff. of Scott Bratlien ¶ 5.) Upon arrival at Division 10, he was taken to tier 3D, where officers told Morgan he could not take his crutches to his cell. (Defs.' Facts ¶ 25; Morgan Dep. at 39.)

A major part of Morgan's complaint revolves around the fact that he was not permitted to take his crutches to his cell. He alleges that he was "initially issued a pair of crutches with a permit allowing plaintiff use of such crutches at all times by the medical staff at Cermak Hospital." (Am. Comp. ¶ 21.) Because of the prior amputation of toes on his right foot as well as the soft cast on his left foot, he testified, he had a hard time keeping his balance without crutches. (*See* Morgan Dep. at 55.)

The record does not support Morgan's allegation about the nature of his permit. Morgan admits he had a prescription for "routine" use of crutches. (Defs.' Facts ¶ 21; Medical Record at 170.) A "routine" medical device prescription differs from a "24/7" or "all access" prescription. ( Defs.' Facts, Ex. G, Aff. of Dr. Sunita Williamson ¶ 9.) A pretrial detainee with a "24/7" or "all access" medical device prescription can keep the device with him or her at all times, including bringing the medical device to the living unit. (Miller Aff. ¶ 7; Bratlien Aff. ¶ 8; Williamson Aff. ¶ 9) A detainee with a "routine" medical devise prescription cannot bring the device into the living unit; for security reasons, the device is kept in the unit office or "bubble." ( Miller Aff. ¶ 6; Bratlien Aff. ¶ 7.) Apparently, the detainee is given the crutches when the detainee needs them to go to the dispensary or recreation. (*See* Morgan Dep. at 67-68.)

Morgan compares his situation on tier 3D of Division 10, where crutches and canes are not allowed to be taken to the detainee's cell, to tier 3C of Division 10, the "handicap deck," where, he

4

believes, detainees are permitted to have crutches and canes in a greater number of circumstances, including the shower and day room. (Morgan Dep. at 41.) He believes he should have been moved to tier 3C. (*Id.* at 49-51.) Morgan testified that he asked various sergeants to see if he could be moved (*id.*), but he did not file a grievance about his situation until July 10, 2012 (*id.* at 45).

On July 5, 2012, Plaintiff was seen by a physician's assistant for a follow-up, who noted that Morgan was "on tier where he cannot keep crutches" and that she "spoke with nurse manager who will be arranging [patient] be moved to a tier where he can keep crutches at all times." (Pl.'s Fact Resp. at 1; Morgan Dep. 58-59; Medical Record at 26-27.) There is no evidence in the record that Morgan was given a "24/7" or "all access" prescription or that he was moved to a different tier.

On July 10, 2012, Morgan filed a grievance stating that he would like help with his pain and to be able to use his crutches to move around. (Am. Compl. ¶ 26.); (Compl., Ex. A at 2.) [Dkt 1.] On July 13, 2012, Plaintiff received a refill of his Motrin pain medication and the treating nurse noted that plaintiff had a "current and up to date crutches order." (Medical Record at 28-29.)

On July 15, 2012, Morgan's tier was scheduled for outdoor recreation time. (Morgan Dep. at 69-70.) Morgan's tier had outdoor recreation two or three times per week. (Id. at 115-16.) He had not had a problem before, but on July 15, the officer on duty at the time went to the office where Morgan's crutches were stored and discovered they were not there. (Defs.' Facts ¶ 26; Morgan Dep. at 72, 115-16.) That same officer instructed Morgan to go to the division dispensary for another pair of crutches. (Morgan Dep. at 74-75.) Morgan did so and was provided with the only available pair of crutches, which were too big. (*Id.* at 76-77.) Morgan then proceeded to go to recreation. (*Id.* at 77.)

5

On the evening of July 16, 2012, Morgan slipped and fell in the shower because, he states, he did not have access to a shower chair or his crutches. (Defs.' Facts ¶ 29; Morgan Dep. at 79-80.) He had previously been showering using the shower head next to the wall, but on that day there were too many people in the shower and he had to go to the middle. (Morgan Dep. at 79-80.) Morgan testified that he injured his foot and back in the fall, and he was taken to Cermak via wheelchair by a nurse and an officer. (Defs.' Facts ¶¶ 29-30; Morgan Dep. at 82, 84.) Dr. Williamson was working the 8 p.m. to 8 a.m. shift at Cermak on the night of July 16, 2012. (Williamson Aff. ¶ 3.) Upon examining Morgan, Dr. Williamson ordered x-rays of Morgan's left foot and back. (Defs.' Facts ¶ 33; Williamson Aff. ¶ 4; Medical Record at 171-72.) According to Dr. Williamson, Cermak does not have the capability to perform x-rays during the overnight shift, and, based on her examination of Morgan, his condition was not serious and did not indicate that he required immediate medical care. (Williamson Aff. ¶¶ 5, 8.) Morgan was then taken back to Division 10 and now alleges that he did not receive medical care on the night of July 16, 2012. (Defs.' Facts ¶ 31; Morgan Dep. at 82-84.) The next day, July 17, Morgan was taken back to Cermak for x-rays of his left foot and back and was prescribed pain medication. (Defs.' Facts ¶ 34; Morgan Dep. at 85-86, 96; Medical Record 280-81.) The x-ray results identified Morgan's "[m]inimally displaced fracture of the base of the fifth metatarsal . . . with minimal interval healing" and "[n]o acute fracture or dislocation" of the coccyx. (Defs.' Facts ¶ 35; Medical Record at 280.)[5]

On July 19, 2012, Morgan testified, he was going through security to go to Cermak when he saw wheelchairs. (Morgan Dep. at 92.) He asked Officer Hawker, who was operating the security

---

[5] The os coccygis, or the coccyx, is "[t]he small bone caudad to the sacrum in humans, formed by union of four . . . rudimentary vertebrae, and forming the caudal extremity of the vertebral column." *Dorland's* 1340.

machine, to get him a wheelchair. (*Id*. at 88-89.) Hawker refused, Morgan responded, and Officer Hawker gave him a disciplinary ticket for disobeying a direct order. (*Id*. at 90.) Morgan was in segregation for fifteen days. (*Id.* at 95.)

On August 2, 2012, Morgan saw an orthopedist who removed his soft cast. (Defs.' Facts ¶ 36; Morgan Dep. at 98; Medical Record at 40). Morgan was seen for several follow-up appointments on August 6, September 11, and October 9, 2012. (Defs.' Facts ¶ 37; Medical Records at 42-46, 56.) The treating doctor ordered additional x-rays of Morgan's left foot at the September 11 appointment. (Defs.' Facts ¶ 37; Medical Record at 47.) Those x-rays identified a "healed fifth metatarsal fracture." (Defs.' Facts ¶ 38; Medical Record at 282.)[6] Morgan filed this lawsuit on October 1, 2012. [Dkt 1.] At the October 9 follow-up, Morgan was referred to physical therapy. (Defs.' Facts ¶ 39; Medical Record at 56.) Morgan attended seven physical therapy sessions from November 19, 2012 through February 14, 2013 during which his self-reported pain decreased from a six to a three. (Defs.' Facts ¶ 40; Medical Record at 68-81, 94-105, 109-12.)

Morgan testified that he was in Division 10 until February 2013 when he was moved to Division 9, which is also a maximum security division. (Morgan Dep. at 119.) He testified that he was never denied access to the dispensary at Division 10. (Id. at 44.)

At a follow up appointment on June 10, 2013, the treating doctor ordered additional x-rays of Morgan's left foot because he continued to complain of pain. (Medical Record at 118-19, 182.) The radiologist who reviewed those x-rays found "[n]o acute fracture-dislocation. Questionable healed fracture deformity of the proximal fifth metatarsal." (Defs.' Facts ¶ 42; Pl.'s Facts at 2;

---

[6] Morgan disputes this and states that the x-ray indicated that "[m]ild adjacent soft tissue swelling is present." (Pl.'s Facts at 2; Medical Record at 282.) The finding to which Morgan directs the court appears to be referencing the June 13, 2012 x-ray, not the September 11, 2012 x-ray.

7

Medical Record at 281.) Morgan's last documented medical treatment at CCDOC was on July 24, 2013 for a psychiatry referral. (Medical Record at 182.) At some point after that, Morgan was transferred to the custody of the Illinois Department of Corrections ("IDOC"). (*See* Morgan Dep. at 109-10.) Morgan still complains of pain in his left ankle and foot, but has not seen a doctor while at IDOC. (*Id.* at 110.) Morgan reports that it costs $5 to see a doctor and he needs to use the money he has for hygiene purposes. (*Id.* at 110-11.)

## LEGAL STANDARD

Summary judgment on all or part of a claim or defense is proper, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To oppose a motion for summary judgment successfully, the responding party may not simply rest on its pleadings, but rather must submit evidentiary materials showing that a material fact is genuinely disputed. *See* Fed. R. Civ. P 56(c)(1). A genuine dispute of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the responsibility of identifying applicable evidence. *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). In determining whether a genuine issue of material fact exists, the court construes all facts and draws all reasonable and justifiable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. The Court may not make credibility determinations, "choose between competing inferences," or weigh the evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).

## DISCUSSION

Morgan alleges that the defendants violated his constitutional rights under both the Eighth and Fourteenth Amendments. (Am. Compl. at 2.) The Eighth Amendment's prohibition of cruel and unusual punishment only applies to convicted individuals. *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). At the time of the alleged violation, Morgan was a pretrial detainee and therefore protected by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment. *Id.; Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000). As a practical matter, the distinction does not affect Morgan's claim or this court's analysis because § 1983 claims brought under the Fourteenth Amendment are analyzed similarly to those brought under the Eighth Amendment. *Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007); *Higgins v. Correctional Med. Servs. of Illinois, Inc.,* 178 F.3d 508, 511 (7th Cir. 1999).

Morgan has sued each defendant individually and in his or her official capacity. (Am. Compl. ¶ 20.) The court addresses each type of liability in turn below.

### I. Official Capacities

"An official capacity suit is tantamount to a claim against the government entity itself." *Guzman,* 495 F.3d at 859. By suing the defendants in their official capacities, Morgan has alleged a claim against Cook County. *See Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011). It is well-settled that a municipality can be held liable for violating the civil rights of an individual if the constitutional violation is caused by an official policy through (1) an express policy; (2) a widespread practice that, although not officially authorized, is so well-settled as to constitute custom; or (3) an official person with final policymaking authority. *Teesdale v. City of Chicago,* 690 F.3d

829, 833-34 (7th Cir. 2012); *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009). Additionally, Morgan must also show that the official policy or custom was the moving force behind the alleged constitutional violation. *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir 2008).

### A. Express Policy

"The express policy theory applies . . . where a policy explicitly violates a constitutional right." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). It is not entirely clear what policy Morgan claims caused the violation of his constitutional rights. His amended complaint alleges that there was a failure "to provide a safe shower environment for handicapped persons and denying a handicapped person use of crutches." (Am. Comp. ¶ 44.) At his deposition he referred to the rule to "keep the cane and crutches . . . off the deck," and appears to argue that this is the policy that deprived him of his rights and resulted in injury. (Morgan Dep. at 130.)

The facts before the court on this motion do not demonstrate that there was a policy or custom to deprive handicapped inmates of the use of crutches or to provide an unsafe shower environment. In fact, Morgan testified that he believes there is a tier in which inmates are allowed to keep their medical assistive devices. His complaint is that he wasn't assigned to that tier. As for the shower, Morgan apparently was able to shower successfully without his crutches for one month, until he fell on July 16, 2012.

Morgan did not have a "24/7" or "all access" prescription, and, as a result, he was not allowed to have his crutches at all times. Officials told Morgan that he could not bring crutches into his cell because they posed a security risk. (Defs.' Facts ¶ 25; Morgan Dep. at 39-40.) They also

mentioned a fight that had broken out on the tier the previous week. (Morgan Dep. at 39-40.) "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation . . . of . . . constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). Based on the evidence before the court, as well as the uncertainty regarding the claimed official policy at issue here, a reasonable jury could not find that an express policy at CCDOC violated Morgan's constitutional rights.

### B. Widespread Practice

The widespread practice theory is applicable when a series of violations exist; isolated acts of misconduct are not sufficient. *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003). Morgan does not seem to be making an argument under this prong because he does not point to a pattern of violations.

### C. Official Policymaker

Morgan also appears to allege that Sheriff Dart, Director Miller, and Superintendent Bratlien, as policymakers, caused his constitutional violation by creating polices that resulted in "unsafe conditions for handicapped persons." (Am. Comp. ¶¶ 44-46; Morgan Dep. at 129-33.)[7] Authority to make municipal policy and to act as a final policymaker is a question of state law. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986). Case law has established that "Illinois sheriffs have final policymaking authority over jail operations." *DeGenova v. Sheriff of DuPage County,* 209 F.3d 973, 976 (7th Cir. 2000). Therefore, Sheriff Dart is the sole policymaker here, and for that reason,

---

[7] By agreement, the complaint was amended to reflect the correct name of the Defendant Superintendent, Scott Bratlien (not Bradley). (Order, Dec. 5, 2013.) [Dkt 26.]

the claims against Director Miller and Superintendent Bratlien as policymakers in their official capacities fail as a matter of law. *See Guzman,* 495 F.3d at 860. Further, because employees' actions cannot "be attributed to the Sheriff under the doctrine of respondeat superior," none of the other defendants named in their official capacities can be held liable. *Id*. For those reasons, summary judgment is granted to Director Miller, Superintendent Bratlien, Sergeant Jones, Sergeant Perry, Officer Harris, Officer Hawker, and Dr. Williamson in their official capacities.

Turning back to Sheriff Dart in his role as official policymaker, the Supreme Court has held that "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing the final policy . . . ." *Pembaur*, 475 U.S. at 483. Morgan does not provide evidence of a specific decision or action Sheriff Dart made that resulted in Morgan's alleged constitutional violation. Nor has he put forth any evidence that Sheriff Dart was even aware of his grievances. Absent an action, decision, or awareness on the part of Sheriff Dart, Morgan's claim against him in his role as policymaker must fail. *See Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001). For that reason, summary judgment is granted as to Sheriff Dart in his official capacity.

## II. Individual Capacities

"Section 1983 creates a cause of action based upon personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994). In order "[t]o recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Gentry v. Duckworth*, 65 F.3d 555, 561

(7th Cir. 1995). To be personally culpable, an official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (internal quotation omitted).

Defendants argue that Morgan's amended complaint lacks information establishing that Defendants Dart, Miller, and Bratlien had personal knowledge as to Morgan's incarceration or alleged violations at CCDOC. (Defs.' Mem. at 8; Defs.' Reply at 4-5.) The court agrees as to defendants Dart and Miller; there is no evidence before the court to indicate that either of them had personal involvement with Morgan in any demonstrable way. For that reason, summary judgment is granted to defendants Dart and Miller in their individual capacities. *See Palmer* 327 F.3d at 594. The court turns to the remaining six defendants who Morgan alleges were personally involved in the alleged violation of his rights.

### A. Deliberate Indifference to a Serious Medical Need

To sustain his claim of deliberate indifference in violation of the Fourteenth Amendment, Morgan "must show 'that he had a serious medical need and that a defendant was deliberately indifferent to it.'" *See* Norfleet *v. Webster*, 439 F.3d 392, 395 (7th Cir. 2006) (quoting *Garvin v. Armstrong,* 236 F.3d 896, 898 (7th Cir. 2001)).

#### 1. *Serious Medical Need*

"'A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Indicators that a prisoner has a serious medical need include: "'[t]he

existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir. 1997) (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992)).

Defendants argue that Morgan's deliberate indifference claim fails because his foot injury was not a serious medical condition. (Defs.' Mem. at 10; Defs.' Reply at 5-6.) A condition is serious if, left untreated, significant injury or unnecessary pain likely will result; it need not be life-threatening. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Further, courts have held that a wide range of conditions, including a broken bone, dislocated finger, and arthritis, constitute serious medical needs. *Roy v. Elyea,* 631 F.3d 843, 861 (7th Cir. 2011).[8] For purposes of summary judgment, Morgan has demonstrated that he was suffering from a serious medical condition.

### 2. *Deliberate Indifference*

In order to meet the deliberate indifference prong of his Fourteenth Amendment claim, Morgan must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes,* 546 F.3d at 524 (citing *Greeno*, 414 F.3d at 653). A prison official recklessly disregards an inmate's needs when he knows of a substantial risk of harm to the inmate and ignores that risk. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). Negligence, a difference of opinion about how an inmate should be treated, and even admitted medical malpractice does not itself give rise to a

---

[8] Defendants argue that a fracture is not a broken bone. (Defs.' Mem. at 11; Defs.' Reply at 6.) According to Dorland's, a fracture is just that: "a break or rupture in a bone." *Dorland's* at 740.

14

constitutional violation. *Norfleet*, 439 F.3d at 396. "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment." *Norfleet,* 439 F.3d at 396.

### Superintendent Bratlien

Superintendent Bratlien was the Superintendent of Division 10 when Morgan resided there. (Am. Compl. ¶ 6.) The only evidence in the record of Superintendent Bratlien's involvement with Morgan is his response to one of Morgan's grievances on July 23, 2012. (Compl., Ex. B.) In that grievance, Morgan states that "[t]his grievance is about [Officer] Hawker trying to force me to walk to Cermack [sic] and threaten[ing] me with seg[regation]." (*Id.* at 2.) In response, Superintendent Bratlien wrote, "You were scheduled to see a doctor but refused." (*Id.* at 3.) Morgan's appeal of this grievance appears to have been denied. (*Id.*)[9] This is the extent of the evidence presented on Superintendent Bratlien's involvement with Morgan. Even when construing the facts in the light most favorable to Morgan, no reasonable jury could find that Superintendent Bratlien intentionally or recklessly disregarded Morgan's needs based on this sole grievance response. Therefore, summary judgment is granted as to Superintendent Bratlien in his individual capacity.

### Sergeant Jones

Sergeant Jones was assigned to Division 10 when Morgan resided there. (Am. Compl. ¶ 9.) Morgan testified that Sergeant Jones explained to him that some detainees used medical devices as

---

[9] The exhibits are very light and difficult to read.

weapons which resulted in a ban on housing crutches and canes in inmates' cells. (Morgan Dep. at 46.) Morgan also stated that he spoke with Sergeant Jones about his injured foot and that when he told Sergeant Jones he needed a shower chair, Sergeant Jones told Morgan that he could not have one on that deck. (*Id.* at 52, 77-79.)

"Non-medical defendants . . . can rely on the expertise of medical personnel," and are "justified in believing that a prisoner is in capable hands." *Arnett*, 658 F.3d at 755. Morgan had a paper prescription for "routine" use of crutches, not a "24/7"or "all access" prescription. (Defs.' Facts ¶¶ 20-22.) Jones had no reason to question that. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (affirming summary judgment in favor nonmedical officers when there was no evidence they knew Plaintiff was being mistreated and the officers were not trained to assess the treatment). Because no reasonable jury could find that Sergeant Jones acted with deliberate indifference, summary judgment is granted as to Sergeant Jones.

Sergeant Perry

Sergeant Perry was assigned to Division 10 when Morgan resided there. (Am. Compl. ¶ 10.) When asked why he sued Sergeant Perry, Morgan testified that Perry did not help him or transfer him to tier 3C, the handicap deck. (Morgan Dep. at 49.) Morgan was under the impression that Sergeant Perry could transfer inmates to that deck. (*Id.* at 50-51.) Morgan stated that he spoke with Sergeant Perry about his injured left foot and the four amputated toes on his right foot, and that the nurses told him he was on the wrong deck. (*Id.* at 52-54.) Morgan said he felt that Sergeant Perry should have been "more professional and put a word in and get me" on the handicapped deck. (*Id.* at 53.) For the same reasons as to Sergeant Jones, no reasonable jury could find that Sergeant Perry violated

Morgan's constitutional rights. Summary judgment is granted as to Sergeant Perry.

Officer Harris

Officer Harris was assigned to Division 10 when Morgan resided there. (Am. Compl. ¶ 11.) Morgan testified that Officer Harris was a shift officer in Division 10 who told Morgan that he could not have his crutches on the deck. (Morgan Dep. at 40, 74.) Morgan testified that on July 15, 2012, Officer Harris told him that his crutches were not in the office where they should have been. (Am. Compl. ¶ 28; Morgan Dep. at 71-72.) Morgan further testified that Officer Harris told him that if he wanted a pair of crutches he had to "walk down to the dispensary to find a pair." (Am. Compl. ¶ 28; Morgan Dep. at 74.) Morgan also testified that there was an elevator he could have used to go to the dispensary, but that he walked down the stairs instead. (Morgan Dep. at 74-75.) He further testified that Officer Harris did not force him to walk down the stairs. (*Id.* at 75.) Morgan also testified that when he told Officer Harris that he needed a shower chair, Officer Harris told Morgan that he could not have one on that deck. (*Id.* at 77-79.) For the same reasons as to Sergeants Jones and Perry, no reasonable jury could find that Officer Harris acted with deliberate indifference. Summary judgment is granted as to Officer Harris.

Officer Hawker

Morgan alleges that Officer Hawker was assigned to Division 10 when he resided there. (Am. Compl. ¶ 13.) Morgan testified that he first encountered Officer Hawker on July 19, 2012 on his way from Division 10 to Cermak. (Morgan Dep. at 87-88.) Morgan stated that he showed Officer Hawker his crutches and bruises, told him that his back was in pain, that he hurt his foot, and

that his other foot was amputated. (*Id.* at 89.) He further testified that Officer Hawker refused to get him a wheelchair or a nurse. (Am. Compl. ¶ 31; Morgan Dep at 89-90.) Morgan then stated that Officer Harris put him in a holding cell and later segregation for disobeying a direct order. (Am. Compl. ¶ 31; Morgan Dep. at 90.) For the same reasons as Sergeants Jones and Perry and Officer Harris, no reasonable jury could find that Officer Hawker acted with deliberate indifference. Summary judgment is granted as to Officer Hawker.

Dr. Sunita Williamson

Dr. Williamson was working the night shift at Cermak on July 16, 2012, the night that Morgan slipped and fell in the shower. (Williamson Aff. ¶ 3; Am. Compl. ¶ 29; Morgan Dep. at 82-83.) Morgan testified that Dr. Williamson would not see him that evening and that he was taken back to Division 10. (Morgan Dep. at 82-84.) He further testified that he was taken back to Cermak the next day, July 17, for x-rays. (*Id.* at 84.) Morgan alleges that he still experiences pain in his ankle and lower back. (Am. Compl. ¶ 35.)

Dr. Williamson ordered x-rays of Morgan's left foot and back on July 16, 2012. (Defs.' Facts ¶ 33; Williamson Aff. ¶ 4; Medical Record at 171-72.) According to Dr. Williamson, Cermak does not have the capability to perform x-rays during the overnight shift and that based on her examination of Morgan, his condition was not serious and did not indicate that he required immediate medical care. (Williamson Aff. ¶¶ 5, 8.) Morgan had x-rays taken on July 17, 2012 which revealed that the fracture in his left foot had minimal healing and that there were no fractures in his back. (Defs.' Facts ¶ 34, 35; Medical Record at 280-81.) Following those x-rays, Morgan saw an orthopedist, had additional x-rays that indicated his foot had healed, and participated in physical

therapy. (Defs.' Facts ¶¶ 36-40.)

Although Morgan expressed dissatisfaction with Dr. Williamson's treatment, "medical professionals are not required to provide 'proper' medical treatment to prisoners, but rather they must provide medical treatment that reflects 'professional judgment, practice or standards.'" *Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir. 2008) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). The Supreme Court has held that the "question whether an [x]-ray or additional diagnostic techniques . . . is indicated is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. After examining Morgan, Dr. Williamson's decision to take x-rays of Morgan's foot and back the following day reflected her professional medical judgment. Based on the evidence before the court, no reasonable jury could find that Dr. Williamson acted with deliberate indifference towards Morgan's medical needs. For that reason, summary judgment is granted as to Dr. Williamson.

## CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment [dkt 65] is granted. Judgment is entered in favor of the defendants and against the plaintiff.

IT IS SO ORDERED.

## NOTICE TO PLAINTIFF ABOUT APPEAL

If Morgan wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Morgan appeals, he will have to pay the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150

F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, Morgan could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. *Ibid.* If Morgan seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

Morgan need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Morgan wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

/s/ Geraldine Soat Brown

Geraldine Soat Brown
United States Magistrate Judge

Dated: September 4, 2015